UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
THOMAS P. CUSHING and CYNTHIA
CUSHING

              Plaintiffs,

**MEMORANDUM & ORDER**

     -against-

**Civil Action No. 05-3612**

MORNING PRIDE MANUFACTURING,
L.L.C.

             Defendant.
--------------------------------------------------------x

**A P P E A R A N C E S:**

**For the Plaintiff**
**Bornstein & Emanuel, P.C.**
200 Garden City Plaza, suite 201
Garden City, New York 15530
By:    Anthony J. Emanuel, Esq.

**For the Defendant:**
**Miranda Sokoloff Sambursky Slone Verveniotis LLP**
240 Mineola Blvd.
Mineola, New York 11501
By:    Neil L. Sambursky, Esq.
       Todd D. Kremin, Esq.

**HURLEY, Senior District Judge:**

     Plaintiffs Thomas P. Cushing ("Cushing" or Plaintiff) and Cynthia Cushing commenced

this action[1] seeking to recover for injuries sustained by Cushing, a volunteer firefighter for the

Syosset Fire Department on October 3, 2004, while he was fighting a fully developed structural

---

[1] The present action was originally commenced in the Supreme Court of the State of New York, County of New York. Defendants thereafter removed this action to United States District Court for the Southern District of New York. The action was then transferred to this Court.

fire set by the Syosset Fire Department as part of its Fire Prevention Day demonstrations.

Alleging that his gear, manufactured by Defendant Morning Pride Manufacturing, LLC

("Defendant" or "Morning Pride"), was defective, Plaintiff has asserted causes of action based on

(1) New York General Municipal Law § 205-a; (2) breach of express warranty; (3) breach of

implied warranty; (4) design defect; (5) manufacturing defect; and (6) negligence.[2]  Presently

before the Court is Defendant's motion for summary judgment.  For the reasons set forth below,

the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the parties' submission and are uncontroverted unless

otherwise indicated.

**The Manufacturing Process**

In 2000, a company known as "Hi-Tech Fire & Safety, Inc." ("Hi-Tech"), contacted

Morning Pride about providing the Syosset Fire Department ("Syosset") with a protective coat

and pants system ("bunker gear") for structural firefighting.  Hi-Tech submitted specifications to

Morning Pride for bunker gear which were developed by or on behalf of Syosset without any

input or consultation by Morning Pride.  Syosset's specifications called for the bunker gear to be

manufactured with a three layer fabric composition comprised of the following: (1) a Nomex

Omega outer shell - 7.5 ounce/yd² - black aramid rip stop fabric; 92) a Nomex Omega facecloth/3

---

[2] Cynthia Cushing asserts a claim for loss of service, society and consortium. A claim for loss of consortium, "is a derivative claim and can only be sustained if the defendant is found to have been [liable] on the primary claim [of the injured spouse]." *Jones v. United States*. 720 F. Supp 355, 369 (S.D.N.Y. 1989)(citing *Maddox v. City of New York,* 108 A.D.2d 42, 487 N.Y.S.2d 354 (2d Dept.), *aff'd,* 66 N.Y.2d 270, 496 N.Y.S.2d 726 (1985)).  Accordingly a loss of consortium claim will fail if the primary claims fail.  *Jones,* 720 F. Supp. at 369.

layer E-89 spun lace base; and (3) a Crosstech/Nomex facecloth moisture barrier (hereinafter the "Nomex Omega System").  In addition to providing the specifications for the material from which the gear was to be manufactured, Syosset also established additional design criteria for the gear, including: how the bunker coat and bunker pants would close, pocket placement and closure, identifying markings, suspender type, specific knee, cuff and elbow reinforcement, and the type of collar and chin strapping system.  Syosset required the bunker gear to be compliant with "NFPA 1971: Standard on Protective Ensembles for Structural Fire Fighting and Proximity Fire Fighting" ("NFPA 1971").  The Nomex Omega system selected by Syosset was and still is a state-of-the-art fabric composite used in fire fighter protective gear.  Morning Pride's quote to manufacture the bunker gear for Syosset was accepted and the bunker gear was manufactured, then delivered to Syosset.

Morning Pride is a registered company under section 9001 of the International Organization for Standardization ("ISO").  ISO is an independent, international quality control system which helps ensure the highest level of quality control on a consistent basis.  Morning Pride is routinely audited by an ISO quality control system registrar who conducts random, unannounced reviews of Morning Pride's quality control system.  Morning Pride's internal quality control procedures require that it only purchase the major components of the protective gear (such as the fabric) from other ISO 9001 registered companies.

Morning Pride did not manufacture the Nomex Omega System.  It is a Dupont product and was supplied to Morning Pride by a DuPont authorized mill.  Dupont manufactures the fibers involved in the outer shell fabric and the face cloth laminated to the moisture barrier, as well as the spunbonded interlining and the quilted Nomex liner fabric.  The outer shell is a single layer

of Nomex ripstop fabric woven at seven and a half ounces per square yard. Prior to sale, the supplier of the Nomex Omega System was required to have the product independently tested and certified by Underwriters' Laboratories ("UL") as compliant with the requirements of NFPA 1971. The Nomex Omega System supplied to Morning Pride was UL certified. When Morning Pride received the Nomex Omega System at its manufacturing facility in Ohio, it conducted statistically random sample tests of the materials it purchased (in its own certified testing labs) which duplicated the UL testing protocol of the NFPA 1971 standards for, among other things, (a) tear testing; (b) water testing; (c) flame resistence testing; (d) Thermal Protective Performance ("TPP") testing; and (e) Conductive Comprehensive Heat Resistence (CCHR") testing.

Morning Pride employs a bar coded computer automated manufacturing process which guides the items in production to individual work stations and provides the operators at each work station with the design/manufacturing specifications. At each work station, each piece of a particular garment is assembled by hand by a person trained in, among other things, quality control procedures and each individual operator inspects every garment he/she is working on. Above the actual operators, Morning Pride uses a three tiered quality control program during the manufacturing process. First, each production process is overseen by an "in-line" quality control inspector. The in-line inspector checks each item for even a single skipped stitch or a raw edge on a garment. Second, after a particular item is fully assembled, it is then inspected by the "final inspector" who is responsible for all aspects of the final product, including the quality of the materials themselves. The final inspector is to make certain that the items meet the required design specifications. Third, there is a "head inspector" who oversees the quality control

department and checks the work of the final inspectors.

The items manufactured by Morning Pride are also independently tested and certified to the NFPA 1971 standards by UL. In this regard, UL tests the initial product at the time of certification and then it performs quarterly unannounced visits to Morning Pride's plant during which UL pulls products off the line for testing. UL also tests products that it purchases in the field to ensure continuing quality levels. The Syosset bunker gear was UL certified, and as such, Morning Pride was able to put the UL mark on the labels in the gear.

**The Warnings Provided with the Bunker Gear**

Every Morning Pride bunker coat sold has a Fire Equipment Manufacturers and Suppliers Association's ("FEMSA") Official User Information Guide for Protective Garments for Structural Firefighting ("FEMSA Guide") physically attached to it by means of a hang tab which goes through one of the cuffs of the coat so that a user can not put on the coat without first removing the FEMSA Guide. The same FEMSA Guide is also physically attached to the bunker pants through one of the pant legs so the user can not put on the pants without removing the FEMSA Guide. FEMSA Guides were attached to the gear when they were delivered to Hi-Tech with specific instructions to Hi-Tech not to remove the guides so that they reach the firefighters. The FEMSA Guide stresses the limitations of the full system and warn that even with the best protective equipment, a firefighter is always at risk for, among other things, burns and death. It further warns that "[i]f your protective ensemble is exposed to radiant, convective or conductive heat, you may be burned underneath the protective ensemble with no warning and no sign of damage to the protective ensemble!"

In addition to the warning contained in the FEMSA Guide, each piece of bunker

equipment has labeling which contains warnings and describes the limitation of the equipment.

Among other things the label states that the garment should not be used if it is soiled, torn,

abraded, worn or altered from its original condition or if it has not been properly inspected and

maintained by the fire department and that it is designed to be used as a unit and all components

must be properly in place when it is used. It further provides:

> This garment is NOT warranted to be fit for a particular purpose.
> Read carefully the "Warranty Information" in the FEMSA Official
> User Information Guide. If you do not have a FEMSA OFFICIAL
> USER INFORMATION GUIDE, contact the manufacturer. DO
> NOT REMOVE THIS LABEL."

These labels were visibly affixed to both the bunker pants and bunker coat issued to the Plaintiff.

The labeling, instructions and warnings provided with the bunker coat and pants issued to

plaintiff met all the requirements set forth in the "Labeling and Information" section of NFPA

1971 - 2000 edition and were consistent with American National Standards Institute (ANSI)

Z535.4 - American National Standards for Product Safety Signs and Labels - 2002.

**Plaintiff's Bunker Gear**

Plaintiff was issued his bunker gear in 2001 when it was placed in his locker at Syosset.

No representations were made and no written warranty was provided to Plaintiff by Morning

Pride. Prior to October 3, 2004 Plaintiff read and understood the FEMSA Guide provided with

the bunker gear, including the following warning against radiant burn injury and the effect of

compression when kneeling:

> ***Radiant heat burns***
>
> Your protective ensemble does not have to be in direct contact with
> a hot surface or hot object in order for you to be burned. Heat can
> build up in your protective ensemble and pass through your

protective ensemble as the result of exposure to radiant heat. For example, while fighting a fire you may be exposed to radiant heat for a period of time during which your protective ensemble absorbs the heat. Even if you did not compress the system or if you were to kneel or lean against a non-heated surface, the heat absorbed by the protective ensemble may still be great enough so you are burned. Even if you were to merely position your body so that the protective ensemble was pulled tight against your body (as in squatting so that the knee area is pulled tight across the knees, raising your arm so that the shoulder is tight across your upper body, bending your elbow, etc.), you can be burned because of compression.

You do not have to be kneeling or leaning against a surface to be burned. You do not have to compress the layers of your protective ensemble to be burned. You may be exposed to a high enough level of radiant heat for a short period of time that you may be burned with no compression of the protective ensemble. Depending on conditions, you may not feel the heat build-up in and/or pass through, your protective ensemble, before you are burned.

Although he knew the bunker gear had warning labels and could see them each time he put on his bunker coat and pants, Plaintiff did not read the warning labels. He was provided training on how to properly wear the bunker gear and the level of protection it would provide.

Each year from 2001 to 2004, Plaintiff attended the Nassau County Fire Academy ("Fire Academy"). As part of his training at the Fire Academy, Plaintiff participated in approximately three live fire simulation programs per year, each of which consisted of about four live fire training modules while wearing the bunker gear at issue. On two or three occasions during the Fire Academy exercises, Plaintiff was positioned as nozzle man while wearing the bunker gear at issue. In addition to his live fire training at the Fire Academy, prior to October 3, 2004 Cushing also fought four or five residential fires and one or two car fires wearing the bunker gear at issue. In one of the residential fires, Plaintiff was the nozzle man and was approximately six to eight

feet from the flames.

**The Incident at Issue**

Fire Prevention Day at the Syosset Fire Department is an annual event where the Syosset Fire Department exhibits to the community how they operate and includes several demonstrations. In 2004, Fire Prevention Day was held on October 3. The simulation that Plaintiff was assigned to that day took place in a rear town lot located behind the Syosset Fire Department headquarters at 50 Cold Spring Road. Plaintiff was assigned to be the nozzle man on the hose line which would attack the structural fire demonstration.

The structure that was used in the demonstration was a single story, cape-type structure with one window on the right side, exposure 4, of the structure.[3] There were two openings on exposure 1 of the building, each approximately eight to ten feet wide. Chief Richard Roseo, as the officer in charge of Fire Prevention Day in 2004, oversaw all the activities throughout the day, including the oversight of the construction of the structure that was burned in the structural fire demonstration at issue. The method for constructing the structure was not precisely defined and the membership of Syosset who were constructing the structure were "left to their own devices" on how to build it. The only parameters given to the membership responsible for building the structure was that it was supposed to have the general appearance of a single-story residence with one doorway of 35 inches or larger in width. The building was constructed primarily of two-by fours and plywood, with a plywood separation between the left bay and the right bay. Furniture, including a three piece couch and scrap wood left over from the

_____

[3] Firefighters refer to the various sides of a building as exposures, beginning with exposure one (1) as the front; clockwise to the left is exposure two (2), the rear is exposure three (3); and the right side is exposure four (4).

construction of the structure was placed inside the structure prior to its ignition. The structure was ignited by first pouring gasoline in it as an accelerant.[4]

Before the demonstration began, Plaintiff donned his protective gear. The protective gear he was wearing included boots, Morning Pride bunker pants with suspenders, Morning Pride bunker coat, as well as gloves, hood, and self contained breathing apparatus with a face-piece. Under his gear, he was wearing jeans, a short sleeve cotton tee-shirt, cotton underwear and cotton socks.

Plaintiff was stationed on a truck approximately 200 yards from the building which was to be set on fire. When his truck received the call to respond, it drove in and parked twenty to thirty feet from the right side of the building. Plaintiff's truck was the first truck to respond to the fire. When Plaintiff's truck arrived at the building, the fire was already "fully involved", i.e. everything was burning. When he arrived at the building, Plaintiff did a five to ten second size-up of the building while standing behind the fire truck. He then pulled his "folds" of hose off the back of the truck. The size-up and pulling the hose off the truck took approximately 30 seconds. After all of the hose was off the truck, Plaintiff and the other firefighter assigned to that same truck stretched out the hose line and waited for the order from the officer to put water in the hose line. Plaintiff was standing behind the truck, stretching and flaking the hose line for approximately ten minutes, during which time the fire was free burning with red flames burning at approximately six to eight feet off the roof, with black smoke coming off the fire. While standing at the back of his truck, Plaintiff was anywhere from fifteen to thirty feet from the fire and was able to slightly feel its heat. After the five to ten minutes it took to stretch and flake the

[4] The amount of gasoline used is disputed.

hose, it took a "couple" of minutes until the order was given to put water in the hose line.  During

that time, Plaintiff was standing on the exposure 1 side facing the building, about twenty-five feet

from the building and could feel the heat from the building on his skin through his gear.

When the order was given to fill the hose line with water, Plaintiff opened the nozzle and

confirmed that there was appropriate pressure and water flow, made sure there was a continuous

water stream, and then left the hose on for one minute to assure that everything was working

properly with the hose.  When Lt. Morris gave the order to move in, Mr. Cushing followed the

order and began to move in, while holding the nozzle in his right hand and holding part of the

hose with his left hand.  The hose was filled with water but was not spraying water while

Plaintiff moved in towards the fire.  Plaintiff duck walked into position in front of the left side of

exposure of the front of the burning building and allegedly positioned himself approximately

eight feet from the burning structure.  It took less than a minute to duck-walk to his position in

front of the burning structure.  While duck-walking, Plaintiff felt himself getting hotter and

hotter.  Plaintiff was first in line on the hose.  Lt. Morris, who was not working the hose, was

right next to Plaintiff.  When Plaintiff reached the front of the structure, he positioned himself

with his right hand arm fully extended towards the building and his right hand held the hose.  His

left hand was against his abdomen holding the hose so he could control the nozzle.  Plaintiff was

in a kneeling position with his right knee pointing down to the ground at approximately a 45

degree angle, sitting on the heel of his right foot.  His left thigh was parallel to the ground, his

left shin perpendicular to the ground, with his left foot flat on the ground.  He rested his left

elbow on the top of the surface of his bent left leg.  While in this position, Plaintiff was six to

eight feet from the burning structure, facing it straight on.  Lt. Morris was kneeling right next to

Plaintiff.  Having assumed this position, Plaintiff engaged the hose and pointed it towards the

building, moving the hose around in a clockwise motion aiming towards the fire.  Plaintiff was in

front of the burning structure, in the kneeling position with the hose open extinguishing the fire

for approximately one to two minutes.  While in this kneeling position, Plaintiff continued to feel

the heat of the fire.  During the one to two minutes Plaintiff was fighting the fire, it diminished

by an estimated ten percent.  After approximately one to two minutes, Plaintiff began to feel a

tingling sensation in his right leg and right hand in the areas facing the fire, so he relieved

himself of the nozzle and duck-walked away from the fire.  After Plaintiff relieved himself from

his hose line, a second hose line was ordered in as it was needed to extinguish the fire.  Plaintiff

then walked over to the chief and told him he thought he had been burned.  The chief told him to

go behind the engine and he would get an ambulance.  An ambulance was on the scene and

Plaintiff was treated by EMTs, who helped him remove his protective gear.  With his protective

gear removed, Plaintiff could only visibly see burns to his right hand and mid-way up his

forearm, but the blistering was only on his right hand.  When he removed his jeans, Plaintiff saw

blistering on his right thigh.  Lt. Morris was also burned on his cheek through his protective gear,

including the SCBA face piece, during the demonstration at issue; he refused to go to the hospital

as it was not serious enough.

 After the incident, Plaintiff prepared a "State of New York - Workers' Compensation

Board; Volunteer Firefighter's Claim for Benefits."  On the form he described the nature and

cause of the injury as "While Extinguishing Fire at Fire Prevention Day (Demonstration)

Extreme Heat from Fire Penetrated Turnout Fire Gear." (Capitalization in original.)  In a separate

claim form signed by Plaintiff, his response to the inquiry as to how the "accident or sickness"

occurred, was "During Extinguishing Demonstration, Heat from Fire was Extreme- Penetrated Fire Gear." (Capitalization in original.)  Plaintiff understood that there were limitations to the protection of the gear that he wore and that a certain distance, based on how much heat one feels, must be maintained from the fire for the bunker gear to provide protection.  In the past, Plaintiff had maintained a distance of six to eight feet when he was fighting a fire that was not extreme.

**Morning Pride's Examination of Plaintiff's Gear After the Incident**

After the incident at issue, Total Fire Group, a subsidiary of Defendant, conducted an examination of the gear worn by Plaintiff.   The outer shell material in the Nomex Omega system is dyed by the manufacturer under pressure and heat conditions at approximately 500º F.  As a result, when a garment made from the Nomex Omega system experiences temperatures of approximately 500ºF the dye begins to release and there is a cosmetic change to the garments color.  Thus the dye release that occurs on the garments is an accurate indicator that the dye released portion of a garment was exposed to a temperature of at least 500º F.  Morning Pride's examination revealed that Plaintiff's had areas of dye release which meant that the fabric was exposed to a temperature of at least 500º F.  Based on its inspection of Plaintiff's bunker gear, Morning Pride concluded that there was no defect or flaw in any aspect of the manufacturing/assembly  process of Plaintiff's bunker coat and pants.   Morning Pride also concluded that there was no defect or flaw in the Nomex Omega System and that the bunker coat and bunker pants performed equal to or better than the minimum NFPA 1971 standards.

**Plaintiff's Liability Expert**

Plaintiff has designated Eugene J. West as their liability expert**.**   There is a dispute between the parties as to whether West is an expert in "bunker gear."  Defendant contends that

West is not, relying on following excerpt from West's deposition:

> Q. Do you hold yourself out as an expert in bunker gear?
> A. No, I wouldn't say that would be true.

West. Dep. at 48.    Plaintiff, relying on an affidavit of West, contends that West is an expert in bunker gear as it relates to its proper performance and fire protective qualities and that his expertise is as a fire marshal conducting investigations to determine whether bunker gear should be taken out of service and evaluating its performance based upon a visual inspection.  Plaintiff does not dispute, however, that West is not an expert in the following areas: the design of bunker gear, the manufacture of bunker gear, the NFPA performance standards for bunker gear, fabrics or the properties of fabrics used in the manufacture of bunker gear, fiber sciences, polymer sciences, clothing design, spectrophotometry[5] and warnings.   There is, however, no *Daubert* challenge before the Court.

West's investigation in preparation for his report included a reconstruction of the fire scene, photographs of the fire scene, inspection of Plaintiff's bunker coat and bunker pants together with the remainder of his firefighting ensemble (i.e. helmet, SCBA hood, boots and gloves), inspection of Lt. Morris' fire gear, the review of deposition transcripts, interview of Plaintiff and speaking with people at the fire house about the incident. West did not recall if he ever studied (including as part of his investigation in this case) the performance characteristics of the composite used in the Syosset bunker gear.  Nor could he recall any studies or specific written information he obtained and/or reviewed with respect to the composite used in the

---

[5]  The National Institute of Standards and Technology, a non-regulatory federal agency within the United States Department of Commerce defines  spectrophotometry as "the quantitative measurement of the reflection or transmission properties of a material as a function of wavelength." Http://www.nist.gov/Divisions/Div844/facilities/spectophoto/spectophoto.html.

Syosset bunker gear.  He did not consult anyone about any of the characteristics of the composite in the Syosset bunker gear, although he consulted sources in the fire department and his own partners with regard to the general characteristics of performance of fire gear in a fire scenario under certain circumstances.

West admittedly does not know the following: who designed the fabric for the Syosset bunker gear or when the fabric was designed; the process used by Morning Pride to manufacture Syosset bunker gear; the specifications or performance parameters that Syosset provided to Morning Pride for the bunker gear; if the fabrics in Plaintiff's bunker gear were designed to respond to increasing levels of heat; the dyeing process used for the fabric of the outer shell of the bunker gear; at what temperature the dye is released from the fabric in the bunker gear; what calorie load the Syosset gear was manufactured to sustain; the UL testing procedures for bunker gear; how the numerical TPP rating of the bunker gear is applied; at what temperature the outer trim on the bunker gear melts; the amount of heat transference protection the outer shell of the bunker pants was designed to provide; and the amount of heat transference protection the inner liner of the bunker pants was designed to provide.  West does not know the specific temperature or conditions the Syosset bunker gear was designed to respond to.  He maintains, however, that the bunker gear is to provide an armor of protection when heat is applied to the gear and in "normal ordinary" fire conditions where a "certain distance" is maintained from the main body of fire it would not be expected someone would be burned through the multiple levels of the ensemble.   He admits that if there is compression of a particular element of the gear exposed to radiant heat, the gear may be affected or it may affect the rate that the gear absorbs heat.

West did not do any testing to determine the temperature at which the discoloration of the

Syosset bunker gear occurs. He did not take any measurements of the area where the training exercise at issue occurred or calculate the heat flux that Plaintiff was exposed to. Further, West did not conduct any heat flux testing or analysis and did not perform any testing of the composite used in Plaintiff's bunker gear (or the composite used by the Syosset Fire Department).

West concludes that there was a problem with Plaintiff's gear but does not know the nature of the problem. He opines that because plaintiff's right thigh was burned, the bunker pants must have been defective. He does not have any testing to support this opinion. He cannot point to any flaw in the manufacturing process to support his opinion; rather, he indicates that the bunker pants did not perform properly when it was "put to the test" and therefore there is something wrong with the bunker gear. He admits he does not know of any defect in the manufacturing process of either the inner liner or the outer shell of Plaintiff's bunker pants. West concludes that there was a problem with Plaintiff's bunker gear because Plaintiff and Lt. Morris were exposed to the same fire conditions and, in fact, Lt. Morris was exposed for a significantly longer period of time. Lt. Morris' gear, which apparently was the same as Plaintiff's, protected him from heat induced injuries while Plaintiff's did not. West also points out that the hood worn by Plaintiff, which has a TPP of 20, effectively protected him while the bunker gear, with a higher TPP, did not. According to West, the performance failure of the bunker gear did not occur as a result of exposure to extreme fire conditions, unusual wear, improper maintenance or firefighter error.

West offers no opinion on (1) the warnings provided with the bunker gear and whether they were sufficient; and (2) the design of the bunker gear and whether there was a design defect.

**Defendant's Liability Experts**

Defendant has retained two experts to offer opinions in this case: Steven Spivak, Ph.D. ("Spivak") and Steven Arndt, Ph.D. ("Arndt").

Arndt holds a Ph.D. and M.S. in industrial engineering and a B.S. in psychology. He has specialized knowledge in the areas of human factors, human perception, safety, risk analysis and warnings development and evaluation. Arndt's investigation in this matter included a review of discovery and the warning labels and documents provided with the Morning Pride bunker gear at issue in this case. Based on his investigation Arndt found that the labeling, instructions and on product warning labels were consistent with the American National Standards Institute Z535.4 - American National Standard for Product Safety Signs and labels - 2002 and the requirements set forth in the "Labeling and Information' section of NFPA 1971 - 2000 edition. Arndt concluded that the labeling and instructional material provided with the Morning Pride bunker gear was adequate to convey proper use instructions and to warn about potential hazards associated with the use of the items while performing duties as a firefighter. He also concluded that since Plaintiff read and understood the FEMSA Guide and saw but failed to read the warning labels, additional or alternative labeling would not have altered the outcome in this incident.

Spivak specializes in fire safety, flammability, performance and standards for fibers, fabrics, textiles and clothing, including wearing apparel, uniforms, protective clothing, and personal protective equipment and he has over thirty years of fabric, textiles, clothing, fire and flammability research. His investigation in this case included reviewing discovery in this case, as well as inspecting, evaluating, and testing the bunker gear worn by Plaintiff during the fire demonstration at issue and inspecting the parking lot where the demonstration occurred. He

retained an independent testing laboratory to perform burn testing on an exemplar of the Nomex Omega System so he could scientifically and quantitatively establish the conditions to which Plaintiff was exposed.  Under NFPA 1971, the Morning Pride bunker coat and pants had to achieve a thermal protective performance (TPP) rating of at least 35.  Spivak opines the gear exceeded NFPA standards.

According to Spivak, when a fabric is exposed to heat, depending on the amount of heat, the fabric will, among other things, change its color. More specifically, the material used in Plaintiff's bunker gear materials will lose dye, char or otherwise discolor when exposed to a certain level of heat.  Based on his visual inspection of the gear and comparison of the color measurement data obtained from Plaintiff's bunker gear exposed during the fire, as well as exemplar gear that was subjected to systematic thermal exposure testing, Spivak quantitatively established the time and intensity to which Plaintiff's gear was exposed. Spivak posits that Plaintiff's bunker gear, specifically in the right wrist, hand and lower arm areas, right upper thigh areas above the knee and lesser damage to the left leg area, was exposed to a thermal energy transfer of 1 cal/cm²sec for an exposure time of at least 30 to 40 seconds.

This would indicate a thermal exposure to Plaintiff that is in the range of "severe thermal problems" denoted as "involuntary exposure" and proscribed for a maximum of 15 to 20 seconds and no more.  Such exposure is recognized as "emergency" and beyond what is reported to be "ordinary" for firefighters' exposure conditions.  At the temperatures faced by Plaintiff, protective clothing will be damaged and severe thermal injuries will occur. Also, Spivak opines that Plaintiff's protective clothing had already become pre-heated for at least five and possibly ten minutes during the stretching and flaking of the hose.  Therefore, by the time he was exposed

to the most severe fire conditions, only six to eight feet from the fully developed fire, heat transfer would have occurred rapidly, especially where the bunker pants and coat were pulled taut against his body, such as the right thigh, thereby reducing the insulating value of the air space between the layers of the garment and Plaintiff's skin.

According to Spivak, the overall thermal load and heat transfer that Plaintiff was exposed to were in excess of the SFD and NFPA 1971 thermal protection specifications for such protective clothing ensembles and that the bunker gear performed as expected or better than the NFPA 1971 requirements. Differences in burns and concomitant thermal exposure to Plaintiff were due primarily to differences in compression, fit and air spacing between the thermal liner and Plaintiff's jeans underneath.

Plaintiff maintains that, contrary to Spivak's statements, the charring of the bunker gear is indicative of performance degradation and not merely a cosmetic degradation that affects appearance but not performance characteristics. Further, Plaintiff maintains that Spivak's assertions regarding the time and intensity of Plaintiff's exposure assume that the fabric performed as designed but it did not due to an inherent degradation that originated during the manufacturing process and did not occur as a result of exposure to extreme fire conditions, unusual wear or improper maintenance. Severe thermal burns should never have occurred had this gear been operating and functioning properly. Plaintiff point to the fact that the gear worn by Lt. Morris showed no evidence of heat discoloration, burn patterns or heat transference and West's opinion that Plaintiff and Lt. Morris were exposed to the same fire conditions during the training exercise.

### DISCUSSION

**I. Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings,

conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to

the non-movant to offer "persuasive evidence that [the] claim is not 'implausible.'" *Brady*, 863

F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In deciding a summary judgment motion, a

court must resolve all factual ambiguities and draw all reasonable inferences in favor of the

non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d

Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary

judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth*

*Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v.*

*Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e).

## II. The Parties Contentions

By this motion, Defendant seeks summary on all five cause of action asserted by Plaintiff.

As to the cause of action asserting that there was a design defect in the bunker gear, Defendant's

argument is twofold. First, Defendants cannot be held liable for a design defect because it

manufactured the gear bunker pursuant to the specifications of the Syosset Fire Department.

Second, Plaintiff has failed to proffer evidence sufficient to support a prima facie case of design

defect. Defendants argue it is entitled to judgment on any failure to warn claim given the

uncontroverted evidence that the warning provided by Morning Pride were NFPA compliant and

consistent with ANSI Z 535.4.[6] Also, Plaintiff's failure to read the warning labels physically

attached to the gear precludes the failure to warn claim as a matter of law. With respect to the

breach of warranty claim, Defendant maintains it is entitled to judgment as it made no

representations to Plaintiff and each piece of equipment specifically and conspicuously

---

[6] No failure to warn claim is contained in the complaint. However, Defendant motion's
is premised on the generic assertion of a failure to warn claim in Plaintiff's response to
interrogatories.

disclaimed any express or implied warranty. Defendant seeks judgment on the claim pursuant to New York General Municipal Law § 205-a as it is dependent on a violation of 29 CFR 1910.1656 whose requirements explicitly apply only to "fire brigades, industrial fire departments and private contractual fire departments." Finally, Defendant argues that there is no evidence of a manufacturing defect as its expert testimony establishes that Plaintiff's gear was exposed to heat which exceeded design specifications and therefore it is entitled to judgment.

In response, Plaintiff argues that the motion should be denied in its entirety. However, Plaintiff addresses only the manufacturing defect claim. With respect to that claim, several arguments are raised. First, Plaintiff maintains that the relative positioning of Plaintiff and Lt. Morris indicates that Plaintiff's bunker gear did not provide the protective qualities that it should have performed and a trier of fact can infer the existence of a defect upon a showing that the product did not perform as intended. Plaintiff then questions the expertise of Spivak and points to factors he contends undermine Spivak's opinion. Finally, Plaintiff relies on the absence of any injury to Lt. Morris, who wore identical gear, and the fact that he (Plaintiff) had more protection from his hood, which had a lower thermal protective performance rating than his bunker pants, as evidence of a manufacturing defect in the bunker pants.

### III. Defendant is Entitled to Judgment on The Abandoned Claims

In opposing Defendant's motion for summary judgment, Plaintiff failed to address Defendant's arguments on the claims for design defect, failure to warn, breach of warranty, negligence, and pursuant to N.Y. General Municipal Law § 205-a. There is authority for the proposition that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument

in any way." *Taylor v. City of N.Y.*, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003). *Accord Ostroski v. Town of Southold*, 443 F. Supp.2d 325, 340 (E.D.N.Y. 2006). It is unnecessary for this Court to rely upon that authority in this case. Here, summary judgment is appropriate as Plaintiff has failed to submit evidence raising a triable issue of fact and Defendant is entitled to judgment on the basis of the undisputed facts relating to these claims. Accordingly, summary judgment is granted in favor of Defendant on Plaintiff's claims for design defect, failure to warn, breach of warranty, negligence and pursuant to N.Y. General Municipal Law § 205-a.

## IV. The Manufacturing Defect Claim

A person injured as a result of a defective product may seek relief against the product manufacturer or other entities in the chain of distribution if the defect was a substantial factor in causing the injury. *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764 (1998). It is not necessary to prove the specific defect; proof may be circumstantial. *Codling v. Paglia*, 32 N.Y.2d 330, 337, 345 N.Y.S.2d 461 (1973). Under New York law, "[i]n order to proceed in the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants." *Speller v. Sears, Roebuck and Co.*, 100 N.Y.2d 38, 41, 760 N.Y.S.2d 79, 81-2 (2003). If a plaintiff sustains its burden on both prongs, a jury may infer that the harm was caused by a defective product. *See id.* If, however, the proof is insufficient as to either prong, a jury may not infer that the harm was caused by a defective product unless plaintiff offers evidence identifying a specific flaw. *Id.*

In its motion for summary judgment Defendant has put forth evidence that the bunker gear did perform as intended and that Cushing's burn injuries were caused by the "extreme"

nature of the fire, his close proximately to it and the compression of his gear caused by his kneeling. Accordingly, Cushing was required to come forward with evidence that the gear did not perform as intended and excluding all other causes for the gear's failure not attributable to Defendent. In other words, Plaintiff's burden on this motion was to put forth evidence that the gear did not perform as intended and to exclude the intensity of the fire, his proximity and compression as the cause of his injuries. He has met that burden.

First, there is West's opinion testimony that the nature of the fire was characterizable as normal and not extreme. Second and more importantly, there is the evidence regarding Lt. Morris. Lt. Morris (1) was wearing the same gear as Plaintiff; (2) was kneeling beside Plaintiff as he operated the hose; and (3) was exposed to the fire for a period more extended than was Plaintiff. Yet Lt. Morris did not sustain any serious injury as his bunker gear, compressed like Plaintiff's by kneeling, provided protection against the heat generated by the fire. This evidence is sufficient to raise a triable issue of fact. If credited by a jury, this evidence would permit the jury to conclude that the gear did not perform as intended and that plaintiff excluded all other causes, specifically compression and his proximity to the fire, for his injuries.

Defendant takes the position that because they have submitted expert scientific evidence confirming that Plaintiff was burned because the extreme heat condition to which he was exposed exceeded the design parameters of the bunker gear, Plaintiff could not rely on circumstantial evidence but was required to produce direct evidence of a defect. In support of this proposition Defendant cite *Minda v. Biomet, Inc.*, 1998 WL 817690 (E.D.N.Y. 1998), *aff'd*, 182 F.3d 990 (2d Cir. 1999) and *Winckel v. Atlantic Rental & Sales, Inc.,* 159 A.D. 2d 124, 557 N.Y.S.2d 951 (2d Dept. 1990), among other cases. All of the cases cited by Defendant in

support of this proposition were decided before the New York Court of Appeal's decision in *Speller v. Sears, Roebuck and Co., supra*. In *Speller*, the Court of Appeals rejected this proposition, stating:

> Defendants contend that after they came forward with evidence suggesting an alternative cause of the fire, plaintiffs were foreclosed from establishing a product defect circumstantially but were then required to produce evidence of a specific defect to survive summary judgment. We reject this approach for two reasons. First, such an analysis would allow a defendant who offered minimally sufficient alternative cause evidence in a products liability case to foreclose a plaintiff from proceeding circumstantially without a jury having determined whether defendant's evidence should be credited. Second, it misinterprets the court's role in adjudicating a motion for summary judgment which is issue identification and not issue resolution. Where causation is disputed, summary judgment is not appropriate unless only one conclusion may be drawn from the established facts.

100 N.Y.2d at 43, 760 N.Y.S.2d at 83.

Plaintiff have submitted sufficient evidence to raise triable issues as to whether the bunker gear performed as intended and whether all causes for the gear's failure not attributable to Defendant can be excluded. According, the motion for summary judgment on the claim that Plaintiff's injuries were caused by a manufacturing defect is denied.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is denied as the claim of a manufacturing defect and granted as to the remainder of Plaintiff's claims.

Dated: Central Islip, New York
      January 30, 2008

                             /s/_____
                             Denis R. Hurley
                             Senior District Judge